UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| COMMUNITY ASSOCIATION UNDERWRITERS OF AMERICA, INC., *Plaintiff*, <br><br> v. <br><br> RESTORATION SPECIALTIES, INC. *et al.*, *Defendants*. | No. 3:20-cv-00328 (JAM) |

**ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT**

This lawsuit arises from water damage at a condominium property in Stamford, Connecticut. A property insurance company paid the owner's claim for the water damage and now seeks by subrogation to recover against two defendant contractors who the insurance company alleges caused the damage during a roof replacement project at the property.

But the insurance company's effort to proceed by subrogation fails to account for waiver of subrogation provisions that were embedded in the construction contract between the property owner and the contractors. Although the insurance company argues that these provisions do not apply in this case, its arguments are not convincing. Accordingly, I will grant the defendants' motions for summary judgment against the insurance company.

**BACKGROUND**

The Arbor Green Condominium Association, Inc. ("Arbor Green") is a condominium association company with a property that includes 21 living units in a single building at 25 Second Street in Stamford, Connecticut.[1] Arbor Green's property was insured by the plaintiff Community Association Underwriters of America, Inc. ("CAUA").[2]

---
[1] Doc. #23 at 2 (¶ 2) (amended complaint); Doc. #44-4 at 13 (Rhodes deposition).
[2] Doc. #23 at 1-2 (¶ 2) (amended complaint).

1

This lawsuit arises from property damage that occurred during a roofing replacement project at the Arbor Green property. Because the building's roofing was in very poor condition, Arbor Green's owners authorized the solicitation of bids in November 2018 to replace the roof.[3] Arbor Green accepted a bid from the defendant Restoration Specialties, Inc. ("RSI") to do the work for about $500,000.[4]

Michael Rhodes owned one of the units at the Arbor Green building, and he was serving at the time as president of Arbor Green.[5] In that role, he was responsible for contracting for the roof repairs on behalf of Arbor Green.[6]

A written contract was entered into for the roofing work, using a standard form contract issued by the American Institute of Architects ("AIA").[7] Although the parties agree that there was a contract and that Rhodes was one of the signatories to this contract, they do not agree about whether Rhodes signed the contract on behalf of Arbor Green.

The completed AIA Contract states on the first page that it is between the "Owner"—who is identified as "Mike Rhodes, 25 Second Street, E1, Stamford, CT"—and the "Contractor"—who is identified as "Restoration Specialties, Inc. Tim O'Donoghue, President."[8] The principal signature page includes a signature line for "Owner" and identifies "Mike Rhodes," along with a corresponding signature line for "Contractor" that identifies "Tim O'Donoghue, President."[9] Besides one reference in the invitation to bid form, the contract does not otherwise reference

---

[3] Doc. #47 at 1-2 (¶ 4); Doc. #44-5 at 57 (invitation to bid); Doc. #44-4 at 18 (Rhodes deposition).
[4] Doc. #47 at 2 (¶ 5); Doc. #44-4 at 27 (Rhodes deposition); Doc. #44-5 at 51 (bid price).
[5] Doc. #47 at 1 (¶ 2); Doc. #44-4 at 10-11 (Rhodes deposition).
[6] Doc. #47 at 1 (¶ 3).
[7] Doc. #44-5 (AIA Contract).
[8] Doc. #44-5 at 2.
[9] Doc. #44-5 at 27. Although no signature appears for RSI, there has been no claim that RSI is not bound by the contract. *See ibid.* The contract and related materials include additional references to "Michael Rhodes" or "Mike Rhodes," who is sometimes identified as "Owner." *Id.* at 28, 34-37, 47, 48, 54, 57, 62, 65.

Arbor Green or Rhodes's position as president of Arbor Green.[10]

Under a heading titled "Waiver of Subrogation," the AIA Contract states in pertinent part:

> **§ 17.2.2.7.1** The Owner and Contractor waive all rights against (1) each other and any of their subcontractors, sub-subcontractors, agents, and employees, each of the other . . . for damages caused by fire, or other causes of loss, to the extent those losses are covered by property insurance required by this Agreement or other property insurance applicable to the Project, except such rights as they have to proceeds of such insurance. . . . The policies of insurance purchased and maintained by each person or entity agreeing to waive claims pursuant to this Section 17.2.2.7 shall not prohibit this waiver of subrogation. This waiver of subrogation shall be effective as to a person or entity (1) even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, (2) even though that person or entity did not pay the insurance premium directly or indirectly, or (3) whether or not the person or entity had an insurable interest in the damaged property.
>
> **§ 17.2.2.7.2** If during the Project construction period the Owner insures properties, real or personal or both, at or adjacent to the site by property insurance under policies separate from those insuring the Project, or if after final payment property insurance is to be provided on the completed Project through a policy or policies other than those insuring the Project during the construction period, to the extent permissible by such policies, the Owner waives all rights in accordance with the terms of Section 17.2.2.7.1 for damages caused by fire or other causes of loss covered by this separate property insurance.[11]

RSI eventually completed the work pursuant to the AIA Contract, and Arbor Green in turn paid RSI for its work pursuant to the AIA Contract.[12] The owners of Arbor Green voted to approve a loan and an assessment on the condominium owners to pay RSI for the work completed pursuant to the AIA Contract.[13]

But at some point before RSI's work was completed, there was a roof leak at the property which caused CAUA to pay $80,000 to Arbor Green pursuant to its property insurance policy.[14]

---

[10] Doc. #44-5 at 57 (invitation to bid stating that it is "[b]y order of the Arbor Green Condominium").
[11] Doc. #44-5 at 22; *see also* Doc. #47 at 4-5 (¶¶ 16-17).
[12] Doc. #47 at 5 (¶¶ 18-19).
[13] *Ibid.* (¶ 20).
[14] *Id.* at 6 (¶ 22).

According to the deposition testimony of Rhodes, a worker for RSI or for one of its subcontractors—co-defendant Charter Oak Environmental, LLC ("Charter Oak")—told him that the roof leak occurred when they "tried to snake the drain and punched right through it."[15] Although the parties agree that the leak occurred prior to RSI's completion of the roofing project, they do not agree that the leak occurred as a result of work that was required to be performed by RSI or Charter Oak pursuant to the AIA Contract.[16]

CAUA has filed this lawsuit as subrogee of Arbor Green against RSI and Charter Oak. The amended complaint pleads separate counts against both defendants for negligence and breach of implied warranties.[17] CAUA alleges that RSI "was retained to perform roofing services and supply roofing materials at the subject property," and that its subcontractor, Charter Oak, "negligently attempted to unclog a roof drain with a broom stick, and otherwise performed its work carelessly and not in compliance with the applicable standards of care."[18]

Both defendants have moved for summary judgment. They argue that CAUA's lawsuit is barred by the waiver of subrogation provisions in the AIA Contract.

## DISCUSSION

The principles governing the Court's review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then decide if those facts would be

---

[15] Doc. #44-4 at 39; *see also* Doc. #47 at 6-7 (¶¶ 23-25) (describing Charter Oak's role as subcontractor under the AIA Contract for asbestos abatement work).
[16] Doc. #47 at 6 (¶ 21).
[17] Doc. #23.
[18] *Id.* at 2-3 (¶¶ 8, 10).

enough—if eventually proven at trial—to allow a reasonable jury to decide the case in favor of the opposing party. The Court's role at summary judgment is not to judge the credibility of witnesses or to resolve close contested issues but solely to decide if there are enough facts that remain in dispute to warrant a trial. *See generally Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (*per curiam*); *Benzemann v. Houslanger & Assocs., PLLC*, 924 F.3d 73, 78 (2d Cir. 2019).[19]

The right of subrogation refers in general to the right of one party who has paid compensation to an injured party for harm caused by another party to "stand in the shoes" of the injured party and to seek relief from the responsible party. Insurance companies often bring subrogation actions. In this context, subrogation refers to the right of the insurer to be put in the position of its insured so that it may pursue recovery from parties who are legally responsible to the insured for a loss that has been paid by the insurer. *See Albany Ins. Co. v. United Alarm Servs., Inc.*, 194 F. Supp. 2d 87, 93 (D. Conn. 2000).

Sometimes, however, parties to contracts agree that if one party causes harm to the other party for which the injured party is compensated by insurance, then the injured party will give up its right to seek recovery from the responsible party. This type of agreement is commonly called a "waiver of subrogation," because it has the effect of "waiving" or precluding a subrogation action by the injured party's insurance company. *See generally* Stephen D. Palley and Arlan D. Lewis, *Subrogation Waivers*, CONSTR. LAW. (Fall 2011).

CAUA does not raise a general objection to the enforceability of waiver of subrogation provisions.[20] Instead, CAUA raises two objections to the enforceability of the particular provisions at issue in this case, and I will consider these two objections in turn.

---

[19] Unless otherwise indicated, this ruling omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.
[20] The parties have connections to both Connecticut and New York, and the AIA Contract is unclear whether it should be governed by Connecticut or New York law. *See* Doc. #44-1 at 9-12. The issue is academic, however,

### 1. Whether Arbor Green is a party to the AIA Contract and its waiver of subrogation provisions

CAUA argues that there is a genuine fact issue about whether Arbor Green was even a party to the AIA Contract and its waiver of subrogation provisions. CAUA emphasizes that the contract was signed only by Rhodes as "owner," rather than signed by Rhodes in an official corporate or representative capacity for Arbor Green.

According to CAUA, because the terms of the contract are clear, the parol evidence rule bars consideration of any extrinsic evidence of Rhodes's capacity when he signed the AIA Contract. But the law is plainly to the contrary. As the Connecticut Supreme Court has long recognized, "agency, trust, equitable relation or equity may be shown by parol evidence." *HLO Land Ownership Assocs. Ltd. P'ship v. City of Hartford*, 248 Conn. 350, 359 (1999) (citing *Dale v. Gear*, 38 Conn. 15, 18-19 (1871)). Indeed, this issue was well-settled as of 1858, when the United States Supreme Court explained:

> The contract of the agent is the contract of the principal, and he may sue or be sued thereon, though not named therein; and notwithstanding the rule of law that an agreement reduced to writing may not be contradicted or varied by parol, it is well settled that the principal may show that the agent who made the contract in his own name was acting for him. This proof does not contradict the writing; it only explains the transaction.

*Ford v. Williams*, 62 U.S. 287, 289 (1858); *see also* Restatement (Third) of Agency § 6.01, cmt. c ("[u]nless the contract explicitly excludes the principal as a party, parol evidence is admissible to identify a principal and to subject the principal to liability on a contract made by an agent. The

---

because both States generally allow for the enforcement of waiver of subrogation provisions. *See, e.g., St. Paul Fire & Marine Ins. v. Universal Builders Supply*, 409 F.3d 73, 84 (2d Cir. 2005) (under New York law, the "parties to an agreement may waive their insurer's right of subrogation"); *Best Friends Pet Care v. Design Learned*, 77 Conn. App. 167, 175, 180 (2003) (holding that the AIA contract waiver of subrogation provision does not violate Connecticut law and affirming enforcement of provision on summary judgment because "the clearly expressed intent of the contract was that parties to the contract waive all subrogation claims against each other and their consultants").

parol-evidence rule does not bar proof that an agent made a contract on behalf of a principal").[21]

Accordingly, I may consider extrinsic evidence on the issue of whether Rhodes signed the AIA Contract in his capacity as an agent for Arbor Green. Even viewing the record in the light most favorable to CAUA, it leaves no doubt that Rhodes signed the contract on behalf of Arbor Green rather than on behalf of himself individually. Rhodes was the president of Arbor Green when he signed the contract, and at his deposition he stated repeatedly and unequivocally that he signed it on behalf of Arbor Green in his capacity as its president.[22] Likewise, the other signatory to the AIA Contract, RSI's president, states that it was "entered into between RSI and Arbor Green Condominium Association by and through its representative Mike Rhodes."[23]

According to Rhodes, the owners of Arbor Green voted to authorize the contract with RSI prior to its execution by Rhodes.[24] CAUA admits in its summary judgment papers that RSI completed the work pursuant to the contract, that Arbor Green paid RSI for its work pursuant to the contract, and that the owners of Arbor Green voted to approve a loan and an assessment to pay RSI for the work completed pursuant to the contract.[25] Indeed, CAUA expressly admits that "[b]y way of the AIA Contract, Arbor Green retained RSI to perform roofing services and supply roofing materials at 25 Second Street, Stamford, CT."[26] It makes no sense to admit this fact and

---

[21] My post-argument order on supplemental briefing invited CAUA to respond to these authorities, *see* Doc. #52, but CAUA's supplemental briefing did not address them or provide any other support for its argument that the parol evidence rule bars extrinsic evidence of Rhodes's capacity when he signed the AIA Contract.
[22] *See, e.g.*, Doc. #44-4 at 17 (Rhodes responding "yes" to the questions "did you sign that [agreement between RSI and Arbor Green] on behalf of the association?" and "you signed that in your role as the president?"); *id*. at 27 (Rhodes responding "yes" to the question "[y]our name here [on the AIA Contract], is it fair to say that that is in your capacity as the president of the association?"); *id*. at 32-33 (Rhodes responding "[t]hat's correct" to the question "the signatures that we reviewed [on the AIA Contract], those were your signature in your role as president of the association; is that correct?"); *id*. at 47 (Rhodes stating "I signed the contract, right, on behalf of the association."); *id*. at 48 (Rhodes responding "of course" to the question "you understood that the [AIA Contract] contained terms and conditions of the agreement between the association [Arbor Green] and my client [RSI]?").
[23] Doc. #44-3 at 2 (¶¶ 3-6).
[24] Doc. #44-4 at 17-18.
[25] Doc. #47 at 5 (¶¶ 18-20).
[26] Doc. #47 at 2 (¶ 6).

7

then deny that Arbor Green is a party to the AIA Contract.

Against all this evidence to show that Rhodes signed the contract in a representative capacity for Arbor Green, there is no evidence to suggest that Rhodes signed the contract in his personal capacity. There is no evidence, for example, to suggest that Rhodes wished to personally bind himself—rather than Arbor Green—to a $500,000 construction contract to repair the roofing for an entire condominium association.

It is hornbook law that "[w]hen an agent acting with actual or apparent authority makes a contract on behalf of a disclosed principal, (1) the principal and the third party are parties to the contract; and (2) the agent is not a party to the contract unless the agent and third party agree otherwise." *Green v. XPO Last Mile, Inc.*, 504 F. Supp. 3d 60, 68 (D. Conn. 2020) (quoting Restatement (Third) of Agency § 6.01). Arbor Green is bound by the AIA Contract because Rhodes signed it as Arbor Green's disclosed agent.

In short, there is no genuine fact issue to dispute that Arbor Green was a party to the AIA Contract. Accordingly, I conclude that CAUA is bound as Arbor Green's subrogee to the waiver of subrogation provisions of the AIA Contract.

### 2. *Whether the waiver of subrogation provisions apply to work performed outside the scope of the contract*

CAUA further argues that the waiver of subrogation provisions "should be restricted to damage caused by conduct that is within the scope of the contract" and that "a genuine dispute of material fact exists relating to whether the actions of Defendants that Plaintiff alleges caused the damages were within the scope of the AIA contract."[27] According to CAUA, because there is a genuine fact issue about whether the damage resulted from a "snaking of the drain" that was outside the terms of work authorized by the contract, there correspondingly remains a genuine

---

[27] Doc. #55 at 2; Doc. #46 at 2.

fact issue about whether the waiver of subrogation clauses preclude this lawsuit.

CAUA principally relies on a decision of the New York Court of Appeals in *S.S.D.W. Co. v. Brisk Waterproofing Co.*, 76 N.Y.2d 228 (1990).[28] In *Brisk*, the court held that the waiver of subrogation provision in a predecessor version of the AIA contract "bars subrogation only for those damages covered by insurance which the owner has provided to meet the requirement of protecting the contractor's limited interest in the building-- i.e., damages to the Work itself." *Id*. at 233-34.

But time has not stood still since the *Brisk* decision more than three decades ago. As later court decisions have recognized, *Brisk* interpreted "the effect of a waiver clause contained in the 1976 version of the American Institute of Architect's contract," which "has since been amended for the express purpose of overcoming the holding in *Brisk*." *Mu Chapter Of Sigma Pi Fraternity Of U.S. Inc. v. Ne. Const. Servs. Inc.*, 273 A.D.2d 579, 582 n.2 (3rd Dep't 2000) (interpreting updated version of the AIA contract that is substantially similar to the contract in this case as barring a subrogation action brought pursuant to general property insurance policy not required by the project contract).

As Judge Wood has explained, "[t]he AIA, which drafts these form documents for use throughout the construction industry, takes the view of the dissent in *Brisk* and has chosen to put the ultimate loss on the property insurer who covered the risk. The AIA has made frequent additions to the form document to try to close all of the loopholes and kill subrogation off." *Allianz Ins. Co. of Canada v. Structure Tone (UK), Inc.*, 2005 WL 2006701, at *6 (S.D.N.Y. 2005). Specifically, the AIA added a second waiver of subrogation clause for damages covered by insurance if the owner insures "properties adjoining or adjacent to the site by property

---

[28] Doc. #55 at 1.

9

insurance under policies separate from those insuring the Project." *Ibid*. In this updated AIA form contract, one clause "waives all subrogation rights for any damage covered by insurance specific to the work contracted," while the other "waives subrogation rights as to damages covered by insurance for the property generally." *Id*. at *8. "Read together, the various provisions … evoke a clear intent to preclude recovery of any damages covered by insurance." *Ibid*.

As a result, Judge Wood rejected the same argument that CAUA presses here—that "the waiver … is limited to the scope of 'the work' under the contract"; instead, the "waiver of subrogation therefore applies to all of the damages that were covered by insurance." *Id*. at *6, *8.

By the same token, in cases interpreting more recent versions of the AIA form contract's waiver of subrogation provisions, "[a] clear majority of courts apply the 'any insurance' approach, extending the waiver to all damages insured by the owner's property insurance policy, regardless of whether they represent damages to the Work or non-Work property." *Turner Constr. Co. v. BFPE Int'l, Inc.*, 2016 WL 1169938, at *16 & n.34 (D. Md. 2016) (collecting cases).

Like the versions of the AIA form contract at issue in *Mu* and *Allianz*—and unlike the AIA contract in *Brisk*—the AIA Contract at issue in this case includes two sections waiving subrogation: one specific to the project and a second applicable to property insurance generally. The first, § 17.2.2.7.1, "waive[s] all rights . . . for damages caused by fire, or other causes of loss, to the extent those losses are covered by property insurance required by this Agreement or other property insurance applicable to the Project."[29] The second, § 17.2.2.7.2, provides that "[i]f during the Project construction period the Owner insures properties, real or personal or both, at

---

[29] Doc. #44-5 at 22.

or adjacent to the site by property insurance under policies separate from those insuring the Project … the Owner waives all rights in accordance with the terms of Section 17.2.2.7.1 for damages caused by fire or other causes of loss covered by this separate property insurance."[30]

Read together, these sections unambiguously waive any right to subrogation against RSI and its subcontractors for any damage caused that is covered by property insurance. CAUA alleges in its amended complaint that the damages at issue were covered by its property insurance.[31] That alone is enough to trigger the waiver of subrogation provisions under the terms of the AIA Contract.

In short, the waiver of subrogation provisions collectively apply to foreclose CAUA from seeking recovery against RSI or Charter Oak for the funds it paid to Arbor Green as a result of damages caused by RSI or Charter Oak at the Arbor Green property. Therefore, even assuming there is a genuine fact issue about whether the damages were caused by activities within the scope of work required or authorized by the AIA Contract, this fact issue is not relevant to the applicability of the waiver of subrogation provisions at issue in this case. Accordingly, I conclude that CAUA is bound as Arbor Green's subrogee to the waiver of subrogation agreed to in the AIA Contract.

## CONCLUSION

For the reasons set forth above, the Court GRANTS the defendants' motions for summary judgment (Doc. #44; Doc. #45). The Clerk of Court shall close this case.

---

[30] *Ibid*.
[31] Doc. #23 at 1-2 (¶¶ 2-3).

It is so ordered.

Dated at New Haven this 5th day of August 2021.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge